# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| JOHN SHOVER, *Plaintiff*, v. REGINA CHESTNUT, *ET AL.*, *Defendants*. | CASE NO. 7:18-cv-00202<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

During the time period relevant to this case, Plaintiff John Shover was an inmate at Middle River Regional Jail (MRRJ). Defendants are Regina Chestnut, the medical administrator at MRRJ; Dr. Michael Moran, the jail physician; and Donna Reynolds, a nurse at MRRJ. In a suit brought pursuant to 42 U.S.C. § 1983, Shover alleges that Defendants violated the Eighth Amendment by denying him a cane and a bottom-tier cell, resulting in an injury on the jail stairs. The Court previously denied Defendants' motion for summary judgment, which argued Shover had not exhausted his administrative remedies. (Dkts. 27, 28). Having completed discovery, Defendants now move for summary judgment again, contending that no reasonable jury could find that Shover had a serious medical need for a cane or bottom-tier housing, or that Defendants acted with deliberate indifference toward either alleged need. (Dkt. 67).

Shover concedes that summary judgment should be granted as to Defendants Moran and Reynolds, and the Court will thus grant summary judgment in these defendants' favor.[1] The parties dispute whether Defendant Chestnut acted with deliberate indifference, but the Court finds that no reasonable jury could find that she did. Accordingly, the Court will also grant Chestnut's motion for summary judgment.

---

[1] Specifically, Shover "does not contest that based on the facts adduced in discovery" Defendants Moran and Reynolds are entitled to summary judgment and should be dismissed with prejudice. (Dkt. 71 at 1, n.1).

1

## I. LEGAL STANDARD

Fed. R. Civ. P. 56(a) provides that a court should grant summary judgment if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." V*ariety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## II. FACTS[2]

During the time period relevant to this case—July 25, 2016 through September 1, 2016—Plaintiff John Shover was an inmate at Middle River Regional Jail (MRRJ) in Staunton, Virginia. Shover maintains that he has "permanent nerve damage from [his] knees down to [his] feet" as a result of a back operation in 2014. (Dkt. 71-1 at 8 ("Shover Depo.")). A letter dated April 19,

---

[2] Because all parties agree that summary judgment should be granted as to Defendants Moran and Reynolds, the Court's summary of the facts will focus on those facts pertinent to Shover's remaining claim against Defendant Chestnut. Any fact raised by Defendants but not addressed by Shover will be treated as undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2). The Court further notes that "[t]he responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *see also* Fed. R. Civ. P. 56(c)(1), (3).

2016 from Shover's physician, Dr. Kimberly Dowdell of the Department of Internal Medicine at the University of Virginia (UVA) Health System, states that Shover suffers from deep venous thrombosis, a herniated lumbar disc, hypertension, hip pain in his left hip, sleep apnea, and lumbar stenosis. (Dkt. 68-8). Before his incarceration in July 2016, Shover used "normal orthopedic canes" sold at his pharmacy and sometimes used two canes. (Shover Depo. at 11). Prior to July 2016, Shover navigated stairs in his home "[w]hen [he] had to," such as when he slept in his upstairs bedroom, and had "several falls" that did not require medical treatment. (*Id*. at 11–12, 17).

At Shover's initial intake at MRRJ on July 25, 2016, MRRJ staff noted that Shover reported "nerve damage – from knees down" and previous "back surgeries." (Dkt. 68-2 at 1). Shover avers that he had a cane with him when he arrived at MRRJ but that jail staff confiscated the cane. (Shover Depo. at 12). MRRJ's intake notes list "cane" by a physical assessment column entitled "[l]egs." (Dkt. 68-2 at 1). Defendant Chestnut was not present for Shover's intake and avers that she did not review his intake form. (Dkt. 68-3 at 77–78 ("Chestnut Depo.")). An e-mail sent by Chestnut on September 9, 2016—eight days after Shover's September 1 fall—reflects that MRRJ had "Shover's cane" in "personal property." (Dkt. 71-8).

Following his intake evaluation, Shover was assigned to a cell on the second tier of the jail, where he remained until his fall on September 1, 2016. Shover's placement on the second tier required him to traverse stairs on a daily basis for meals, to return meal trays, for pill calls, to make phone calls, and to utilize the jail's "day room." (Shover Depo. at 14–15).

Chestnut has served as medical administrator at MRRJ since 2014. In this position, Chestnut oversees the medical department, handles scheduling, sometimes answers inmate medical request forms, makes outside medical appointments for inmates, and "can see inmates if

needed." (Chestnut Depo. at 12). Chestnut did not review every medical request form or grievance submitted by an inmate, nor did she regularly review nursing staff's responses to medical request forms and grievances. (*Id*. at 33, 35). MRRJ also employed Dr. Michael Moran as a staff physician, (dkt. 68-5 at 11 ("Moran Depo.")), and Barry Munsey as a physician's assistant ("P.A. Munsey"). (Chestnut Depo. at 19).

During the relevant time period, inmates at MRRJ filled out medical request forms for non-emergency medical issues and provided those forms to jail officers, who then delivered the forms to the medical department. (*Id*. at 17–18). Any available member of the nursing staff could answer these request forms, and all requests were supposed to be answered within 7 days. (*Id*.). In addition to medical request forms, inmates could submit "inmate request forms" directly to security officers. (Shover Depo. at 20, 22; *see, e.g.,* dkt. 71-1 at 8, 10). Inmates could also submit formal grievances within 30 days of the incident complained of; prison officials were to respond to grievances within 9 days. (Dkt. 12-1 at 7).

If an inmate met certain criteria, nurses could unilaterally have the inmate moved to a bottom-tier cell[3] by sending an e-mail "that they would need to be bottom bunk / bottom tier" to the "security officer." (Chestnut Depo. at 20–21, 76; *see also* dkt. 71-2 at 6 ("Kane Depo.")). Nurses could also effectuate moves by issuing medical orders or consulting with a physician or physician's assistant. (Chestnut Depo. at 52). However, nurses did not unilaterally order canes or walkers for inmates; rather, the jail doctor or physician's assistant ordered such equipment upon a finding of medical necessity. (*Id*. at 22–23, 60–62, 69–70, 78; Dkt. 68-4 at 18–19, 31 ("Reynolds Depo."); Moran Depo. at 40–41; dkt. 68-1 ¶ 6 ("Chestnut Decl.")).

Chestnut had six identifiable encounters with Shover prior to his fall on September 1,

---

[3] The term "bottom tier" denotes the ground floor of the jail (*i.e.,* a floor not requiring an inmate to use stairs to access his or her cell).

4

2016. On August 18, 2016, Chestnut reviewed and responded to a medical request form in which Shover asked whether he could continue to take lyrica and oxycodone prescribed to him by an outside physician for pain related to "nerve [and] leg damage caused by a recent back surgery." (Dkt. 71-1 at 73; *see also* Chestnut Depo. at 38, 96; Chestnut Decl. ¶ 9). This request form did not include any request for a cane or a bottom-tier cell. (*Id*.; *see also* Shover Depo. at 18). Chestnut responded: "We will see you and discuss options for you." (Dkt. 71-1 at 73). Chestnut then placed Shover on a list to see the doctor. (Chestnut Decl. ¶ 9).

On August 24, 2016, Chestnut responded to a second medical request form Shover submitted on August 23, 2016. (Chestnut Depo. at 39–40, 97). Shover stated that he was "following up on [his] request last week . . . to see the medical staff concerning [his] Rx meds," noting that he had "since fallen in the pod and hurt [his] knee" and had "great difficulties walking due to the permanent nerve damage to [his] legs." (Dkt. 71-1 at 74). Chestnut responded: "Mr. Shover, you are on the list to be seen today." (*Id*.). This request form did not include any request for a cane or a bottom-tier cell. (*Id*.; Shover Depo. at 19).

Later that day, Shover saw P.A. Munsey, who diagnosed Shover with lower back pain and hypertension but did not note any request for a cane or bottom-tier housing or order either. (Chestnut Depo. at 73–74; Chestnut Decl. ¶ 11). Chestnut was not present at this appointment. (*Id*.). Shover remembers meeting with P.A. Munsey on at least one occasion prior to August 28, 2016. (Shover Depo. at 20–21). Shover recalls asking P.A. Munsey specifically for a cane, and states that Munsey replied that "he could not give [Shover] a cane or issue [him] a cane . . . because it would be considered a weapon and it was against . . . [jail] policy." (*Id*. at 20).

On August 26, 2016, Chestnut responded to a grievance Shover submitted on August 25, 2016. In this request, Shover asked either for a cane or to be moved to the medical infirmary

5

"where I do not have to try and walk unassi[s]ted." (Dkt. 68-7 at 1). Shover stated that P.A. Munsey "reaffirmed that canes are not allowed" at their appointment on August 24, 2016. (*Id.*). Shover noted that he had "been prescribed a walking cane by" his outside physician, Dr. Dowdell, but that MRRJ "would not let [him] bring [his] cane" into the jail at intake. (*Id.*). Shover stated that he had already fallen "several times" on the stairs "in the pod." (*Id.*). Chestnut responded: "Mr. Shover, will get you moved to bottom tier so you don't have to go up and down stairs." (*Id.*). Chestnut avers that this grievance marked her first awareness that Shover was housed on the second tier or that he had requested a cane. (Chestnut Decl. ¶ 12). Chestnut "determined that [Shover] met the criteria which allowed [her] to request that he be moved to [the] bottom tier" because of his "report that he had fallen" but that she "did not have authority to issue him a cane and Mr. Munsey had not ordered one." (*Id.*).

Later that day, Chestnut emailed David Kane, a classification officer at MRRJ, stating the following: "Can we move John Shover to a bottom tier? He states he has fallen several times on the steps. Not sure, but I guess we better be safe. Thanks[.] How is your Grandfather?" (Chestnut Depo. at 48, 100). Kane responded to Chestnut's question about his grandfather but did not respond to her request to move Shover to the bottom tier. (*Id.* at 50–51, 100). Chestnut responded about Kane's grandfather but did not follow up on her request that Shover be moved to the bottom tier. (*Id.* at 51, 100). Chestnut avers that "[a]s far as [she] knew, Mr. Shover would be moved to [the] bottom tier" because Kane "did not indicate that he would not move him or that he did not have any beds available." (Chestnut Decl. ¶ 13).

On the same day, Chestnut responded to a grievance by Shover requesting to be moved to the medical infirmary where he could receive his "medically necessary pain medication." (Dkt. 68-7 at 2). Shover noted that he had seen P.A. Munsey the previous day, and that Munsey had

informed him "that MRRJ does not allow any narcotic medic[i]ne into the jail." (*Id*.). Chestnut responded: "Mr. Shover, Narcotics are only allowed for a short period of time such as if you are post op and just had surgery within the week." (*Id*.). This grievance contained no mention of Shover's previous request for a cane or movement to the medical infirmary, and Shover did not state that he had not yet been moved to the bottom tier. (*Id*.).

On August 30, 2016, Chestnut responded to another medical request form Shover submitted on August 28, 2018, stating that Shover's fiancé—whom Shover sometimes refers to as his wife—would be in touch to arrange an appointment for him to see a "pain specialist at UVA." (Chestnut Depo. at 46, 99; dkt. 71-1 at 75). Chestnut responded: "Mr. Shover, your wife is unable to arrange appointments for you while you are here." (Dkt. 71-1 at 75). This request contained no mention of Shover's request for a cane or that he had not yet been moved to the bottom tier. (*Id*.; Shover Depo. at 21).

On August 31, 2016, Chestnut responded to another medical request form Shover submitted on August 30, 2016, in which Shover "clarified his earlier request stating that he wanted his pain medicine." (Chestnut Decl. ¶ 16; dkt. 71-1 at 76). Shover did not indicate that he had not yet been moved to the bottom tier. (Dkt. 71-1 at 76; Shover Depo. at 24). Chestnut responded: "Mr. Shover, [t]his being a jail there are certain meds that are not prescribed long term due to safety reasons for the inmate. Will put you on the list to see the doctor." (Dkt. 68-2 at 22.). Chestnut asserts that Shover was already being given lyrica. (Chestnut Decl. ¶ 16).

Shover avers that his outside physician, Dr. Dowdell, sent a letter to MRRJ prior to his September 1, 2016 fall, that P.A. Munsey confirmed receipt of this letter during a consultation with Shover, and that he saw the letter in his medical file sometime after his fall. (Shover Depo. at 23–24, 33). Shover stated that his fiancé told him prior to his fall that Dr. Dowdell planned to

send this letter. (*Id*. at 33).[4] This letter—which was not produced by Shover or Defendants prior to Shover's deposition but was later produced by Dr. Dowdell in response to a subpoena—lists Shover's various medical conditions and restrictions regarding lifting, standing, and stretching his back and legs, and notes that "[d]uring times of exacerbation he may require a cane for ambulation." (Dkt. 71-6). The letter Dr. Dowdell produced is dated April 19, 2016 and is unsigned, (*id*.), unlike a letter Dr. Dowdell sent MRRJ in 2017, which is signed and time-stamped at the top. (Dkt. 71-1 at 79). Chestnut maintains that "no such letter exists" in Shover's medical file, where it "would have been placed" upon receipt. (Chestnut Decl. ¶ 19; *see also* Reynolds Depo. at 25; dkt. 68-2 (Shover's MRRJ medical records)).

Shover has produced two earlier inmate request forms—importantly distinguished from *medical* request forms—both requesting that he be transferred to a medical/handicap unit on the ground floor because of fears that he might fall while housed on the second tier. (Dkt. 71-7 at 8–10). These two requests do not appear in Shover's MRRJ medical records, (dkt. 68-2), and Shover presents no evidence that Chestnut was aware of these requests: one appears to have gone unanswered, and the other was responded to by another jail official. (*Id*.). Indeed, Shover cannot remember whether these requests were submitted to Officer Kane directly or to the medical department, (Shover Depo. at 27), but he appears to take the position in briefing that they were submitted directly to Office Kane. (Dkt. 71 at 14).

Shover "do[es] not remember specifically talking to [Chestnut] at pill call" but states that he did request a cane and movement to the bottom tier from nurses who did pill calls. (Shover Depo. at 32). Shover conceded that he did not "know what information the other nurses

---

[4] Shover also maintains that his fiancé told him that Dr. Dowdell "called the jail to try to speak with Dr. Munsey and left a voicemail," (Shover Depo. at 33), but Shover provides no details about the substance of this alleged voicemail.

8

conveyed to [Chestnut]." (*Id*. at 27–28). Shover maintains that he had other encounters with Chestnut prior to his September 1, 2016 fall but could not recall any specific instances, stating only that he "know[s] [he] had conversations with her as well as the other nurses." (*Id*. at 27). Shover raises no evidence of any specific in-person encounters with Chestnut prior to his fall.

On September 1, 2016, Shover fell on the jail stairs, injuring his back. He was hospitalized for two days. Upon his return to MRRJ, Shover was housed in the jail's medical unit for several days, moved to a cell on the bottom tier, and provided with a cane.

### III. ANALYSIS

#### A. Eighth Amendment Deliberate Indifference Standard

"[A] prison official's deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth" in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Id*.

Under the first "objective" prong, plaintiffs must show that the alleged deprivation was "objectively, sufficiently serious.'" *Farmer*, 511 U.S. at 834 (internal quotation omitted). "To be 'sufficiency serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions.'" *Scinto*, 841 F.3d at 225 (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). In medical needs cases, plaintiffs must "demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so

9

obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Under the second "subjective" prong, "plaintiffs must show that prison officials acted with a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "In conditions of confinement cases, the requisite state of mind is deliberate indifference." *Id.* Plaintiffs must show that "the official knew of and disregarded an excessive risk to inmate health or safety," or, in other words, "that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and . . . drew that inference." *Id.* Deliberate indifference "lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Id.* (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). "[M]ere disagreements between an inmate and a physician over the inmate's proper medical care are not actionable absent exceptional circumstances." *Id.* (internal quotation omitted).

"In deliberate indifference to medical needs cases, *Farmer*'s subjective prong requires proof of the official's 'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction.'" *Id.* at 226 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)). Here, plaintiffs "can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)).

A plaintiff can establish a prima facie case of deliberate indifference by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly

noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it." *Id*. (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)). "Similarly, a prison official's failure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Id*. (internal quotation omitted). "However, even officials who acted with deliberate indifference may be 'free from liability if they responded reasonably to the risk.'" *Id*. (quoting *Farmer*, 511 U.S. at 844).

**B.     Prong One – Serious Medical Need**

The first *Farmer* prong requires an inmate to "demonstrate the defendant's deliberate indifference to an objectively sufficiently serious medical need . . . that has either been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goodman v. Runion*, 676 F. App'x 156, 159 (4th Cir. 2017) (internal quotations and citations omitted). Here, Shover specifically claims that Chestnut was deliberately indifferent to his serious medical need for a cane and a bottom-tier cell, and to the substantial risk that he might fall on the jail stairs. (Dkt. 71 at 5, 8).

Shover has offered no evidence that a physician mandated treatment in the form of a cane or bottom-tier housing. Shover concedes that (1) doctors did not order a cane and found him "ambulatory" upon his discharge from August Health on July 25, 2016 (the day his incarceration at MRRJ began), (dkt. 71 at 12); (2) P.A. Munsey did not order a cane or bottom-tier cell following his August 24, 2016 consultation with Shover, (*id*.; *see also* Shover Depo. at 20; Chestnut Depo. at 73–74; Chestnut Decl. ¶ 11); and (3) Dr. Dowdell's April 2016 letter did not

11

mandate bottom-tier housing or limitations on stair usage,[5] and stated only that Shover "may require a cane for ambulation" "[d]uring times of exacerbation." (Dkt. 71 at 8, n.3; *see also* dkt. 71-6). Shover opines that "[t]here is no evidence that Munsey or any medical professional made a medical determination concluding that Shover did not need a cane," (dkt. 71 at 12; *see also* dkt. 71 at 17, n.8), but this confuses the inquiry. To demonstrate a serious medical need by way of a doctor's orders, Shover must present evidence that a doctor mandated a cane or lower-tier housing; mere gestures to the absence of evidence are insufficient. *See Scinto*, 841 F.3d at 225.

However, the Court concludes that Shover has offered evidence that, when viewed in the light most favorable to him, at least creates a genuine dispute of material fact as to whether Shover had a medical need for a cane or bottom-tier housing. First, the parties dispute whether Dr. Dowdell sent the April 19, 2016 letter describing Shover's medical conditions and, if so, whether MRRJ received it. The Court must construe the facts in the light most favorable to Shover, V*ariety Stores,* 888 F.3d at 659, and will thus assume that MRRJ received this letter. As noted above, the letter's contents are insufficient to show that Dr. Dowdell affirmatively ordered bottom-tier housing or a cane, but the letter does mention that Shover suffered from, among other conditions, lumbar stenosis, and that Shover "may" need a cane during times of "exacerbation." (Dkt. 71-6 at 2). Thus, assuming receipt by MRRJ, the letter has some bearing on whether Shover had a serious medical need for bottom-tier housing and/or a cane.

Second, Shover points to one medical request form and two inmate request forms mentioning his placement on the second tier, his prior usage or present need for a cane, and/or his fear of falling. (Dkts. 71-7 at 8–10; 68-7 at 1). Although these requests are evidence

---

[5] The absence of restrictions on stair usage in Dr. Dowdell's letter is significant because the letter imposed other restrictions on how much Shover could lift, how often he should be permitted to stretch his legs and back, and how long he should be made to stand. (Dkt. 71-6).

primarily of Shover's subjective view that he needed bottom-tier housing and a cane, they are nonetheless relevant as to whether those alleged needs would have been objectively obvious to jail officials. Third, the Court must assume the veracity of Shover's allegation that he had a cane with him when he arrived at MRRJ for intake, and MRRJ's intake form appears to note this fact. (Shover Depo. at 12; dkt. 68-2 at 1). Lastly, Shover avers that he fell several times, (*see* dkt. 68-7 at 1), and complained verbally about his need for a cane and bottom-tier housing. (Shover Depo. at 27). Although these individual pieces of evidence may not alone be sufficient to create a genuine dispute of material fact as to Shover's medical need for a cane or bottom-tier housing, taken together they constitute sufficient evidence to permit a reasonable jury to find that Shover had a serious medical need for a cane and bottom-tier housing.

### C. Prong Two – Subjective Deliberate Indifference

Under the second *Farmer* prong, Shover must make a showing that Chestnut's "subjective mental state was that of deliberate indifference." *Hixson v. Hutcheson*, No. 5:17-cv-032, 2019 WL 302516, at *4 (W.D. Va. Jan. 23, 2019). Shover must show that Chestnut "actually knew of and disregarded a substantial risk of serious injury . . . or that [she] actually knew of and ignored a . . . serious need for medical care." *Goodman*, 676 F. App'x at 160 (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 576 (4th Cir. 2001)). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that 'a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Scinto*, 841 F.3d at 226 (quoting *Makdessi*, 789 F.3d at 133).

With respect to Chestnut's alleged indifference to Shover's need for bottom-tier housing, Shover presents no evidence that Chestnut was aware that Shover was housed on the second tier

until August 25, 2016,[6] when Shover noted in a grievance that he had fallen "on the stairs in the pod," and Chestnut responded that she would "get [him] moved to [the] bottom tier so you don't have to go up and down stairs." (Dkt. 68-7). That same day, Chestnut e-mailed Officer Kane and requested that Shover be moved to a bottom-tier cell. (Chestnut Depo. at 48, 100). Thus, even assuming Chestnut knew about Shover's need for bottom-tier housing or his alleged substantial risk of falling on August 25, 2016, Shover presents no evidence, as he must, that Chestnut "disregarded" that need or risk. *Goodman*, 676 F. App'x at 160. Rather, the uncontroverted evidence shows that Chestnut promptly took steps to have Shover moved from the second-tier. Chestnut cannot be held liable for any subsequent failure of security officials to enact her request that Shover be moved. *See Awe v. Mullins*, No. 7:14-cv-00665, 2015 WL 4041315, at *3 (W.D. Va. July 1, 2015) (noting that defendants could not "be held liable for the acts or omissions of security staff, who were responsible for executing [the doctor-defendant's] medical orders for lower-tier cell assignments").

Shover contends that Chestnut's decision to e-mail Officer Kane requesting that Shover

---

[6] Although Shover produced two prior request forms where he explicitly mentioned that he was housed on the second tier, (dkt. 71-7 at 8–10), these were *inmate* request forms apparently submitted directly to Officer Kane, rather than *medical* request forms security officers delivered to the medical department. (*See* Shover Depo. at 20, 22 (noting that forms submitted directly to Officer Kane were visually and substantively distinct from medical request forms); *id*. at 27 (Shover stating he could not remember whether these requests were submitted directly to Officer Kane or to medical department); dkt. 71 at 14 (Shover appearing to take the position in briefing that these two inmate request forms were delivered directly to Officer Kane)). Chestnut did not respond to these requests, (dkt. 71-7 at 8–10), and Shover offers no evidence that she ever reviewed them or other non-medical inmate request forms. Moreover, these inmate request forms do not appear in Shover's MRRJ medical file. (Dkt. 68-2). Under these circumstances, no reasonable jury could infer that Chestnut was or should have been aware of these two inmate request forms. Additionally, Shover offers an August 23, 2016 medical request form—which Chestnut responded to—in which Shover "follow[ed] up" on his previous request for his "Rx meds" and stated that he had "fallen in the pod." (Dkt. 71-1 at 74). But this request did not mention that Shover was housed on the second tier of the pod and did not request housing on the bottom tier (or a cane).

be moved was not "reasonable" because she should have issued a "medical order for [Shover] to be moved." (Dkt. 71 at 16). *See also Farmer*, 511 U.S. at 832 (noting that prison officials must "take reasonable measures to guarantee the safety of inmates"). To be sure, Chestnut stated in her deposition that there were a variety of methods for having an inmate moved to another cell or tier, including issuing a "medical order," "talk[ing] to a provider," or e-mailing security officers directly to request the move. (Chestnut Depo. at 20–21, 52). Of these methods, Chestnut stated that a direct e-mail to security officers was "the best way." (*Id*. at 71–72). Officer Kane similarly stated that it was routine for nurses to communicate requests that inmates be moved to security officers via e-mail. (Kane Depo. at 6). Although Shover disagrees with Chestnut's chosen method of effectuating his move to the bottom tier, no reasonable jury could conclude from these facts that Chestnut "disregarded" or "ignored" Shover's August 25, 2016 request to be moved. *Goodman*, 676 F. App'x at 160. To the extent Shover argues that Chestnut committed an "error of judgment" or was negligent by choosing one method of having him moved over another, "a mere error of judgment [or] inadvertent failure to provide adequate medical care . . . [does] not constitute a constitutional deprivation redressable under § 1983." *Woodson v. City of Richmond, Va*., 88 F.Supp.3d 551, 576 (E.D. Va. 2015) (internal quotations and citations omitted) (alterations in original). Similarly, "negligence is not deliberate indifference." *Id*. Thus, the Court finds that no reasonable jury could conclude that Shover failed to take reasonable steps in response to Shover's alleged need for bottom-tier housing.

With respect to Chestnut's alleged indifference to Shover's need for a cane, Shover similarly presents no evidence that Chestnut was aware of Shover's request for a cane until his

15

August 25, 2016 grievance,[7] when Shover requested that MRRJ *either* "let me use a cane, *or* move me to the medical infirmary, where I do not have to try and walk unassisted." (Dkt. 68-7 (emphasis added)). As discussed above, Chestnut responded that she would "get [him] moved to the bottom tier so [he] wouldn't have to go up and down stairs," (*id*.), and then promptly e-mailed Officer Kane the same day to effectuate that move. (Chestnut Depo. at 48, 100).

Under the circumstances, no reasonable jury could find that Chestnut acted with deliberate indifference to Shover's request for a cane. Chestnut and Reynolds both stated in their depositions that nurses could not unilaterally order canes, walkers, and other such assistive equipment without a doctor or physician assistant's order. (Chestnut Depo. at 22–23, 60–62, 69–70, 78; Reynolds Depo. at 18–19, 31). Shover presents no evidence to the contrary. Thus, although Chestnut did not specifically address Shover's request for a cane, no evidence suggests that she was in a position to act on this request.

Additionally, Shover stated in the August 25, 2016 grievance, and later in his deposition, that he requested a cane during his appointment with P.A. Munsey the previous day—an appointment Chestnut herself arranged—but was told "that canes are not allowed." (Dkt. 68-7; Shover Depo. at 20). Whether Munsey's response was accurate with respect to MRRJ's cane policy and whether Shover agreed with Munsey's determination are both immaterial questions, because Chestnut was "entitled to rely on" Munsey's decision to deny Shover's request for a cane. *Chacon v. Ofogh*, No. 7:08-cv-00046, 2008 WL 4146142, at *5 (W.D. Va. Sept. 8, 2008)

---

[7] Shover presents an inmate request form from August 13, 2016 in which he mentioned that he "used a cain [sic] before coming" to MRRJ, (dkt. 71-7 at 8), but, as noted above, this was not a *medical* request form and does not appear in Shover's MRRJ medical file, (dkt. 68-2). There is no evidence that Chestnut reviewed or responded to this form, nor could this non-medical inmate request form support an inference that Chestnut must or should have reviewed it. Shover could not remember in his deposition whether he gave this (and one other) inmate request form to Officer Kane directly or to the medical department, (Shover Depo. at 27), but appears to take the position that he gave it directly to Officer Kane, (*see* dkt. 71 at 14).

(citing *Miltier v. Beorn*, 896 F.2d, 848, 855 (4th Cir. 1990) and taking "judicial notice of the fact that nurses generally cannot prescribe treatment or overrule a doctor's orders"); *see also Barnes v. Young*, No. 7:12-cv-00067, 2013 WL 5151376, at *6 (W.D. Va. Sept. 13, 2013) ("[O]nce Dr. Hopkins determined that the wheelchair was not medically necessary, Nurse Yates could not overrule the doctor's order, and she was entitled to rely on the doctor's prescribed course of treatment.").

Moreover, Shover phrased his request in the August 25, 2016 grievance in the alternative, asking *either* to be moved *or* to be provided with a cane. (Dkt. 68-7). Although Shover stated in his deposition that the August 25 grievance was actually a request for *both* a cane *and* housing on the bottom tier, (Shover Depo. at 21), that statement is plainly contradicted by the text of the grievance itself. (Dkt. 68-7 at 1). No reasonable jury could find that Chestnut's response granting one of Shover's two alternative requested outcomes constituted deliberate indifference, where the evidence shows that (1) Chestnut had no power to unilaterally grant Shover's request for a cane and (2) Chestnut knew P.A. Munsey had not ordered a cane in his appointment with Shover the previous day after Shover requested one. (Chestnut Depo. at 73–74; Chestnut Decl. ¶ 11; Shover Depo. at 21 (stating that he saw P.A. Munsey at some point before August 28, explicitly raised the issue of a cane, and was not permitted to have a cane by Munsey)).

In sum, viewing the evidence in the light most favorable to Shover, no reasonable jury could find that Chestnut acted with deliberate indifference to Shover's alleged need for bottom-tier housing when Shover has not produced evidence that Chestnut had any awareness of his placement on the second-tier until his August 25, 2016 grievance, at which point Chestnut promptly emailed a security officer to have Shover moved to the bottom tier. Similarly, no reasonable jury could find that Chestnut acted with deliberate indifference to Shover's alleged

17

need for a cane where no evidence exists that she had any ability to grant one and where she knew a physician's assistant had denied one the previous day.[8]

V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment has been granted. An accompanying order has issued. (Dkt. 82). The Clerk of the Court is directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

Entered this  24th  day of May, 2019.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[8] Because the Court concludes that no reasonable jury could find that Chestnut was deliberately indifferent to either of Shover's alleged serious medical needs, the Court will not address Defendants' argument that Chestnut is entitled to qualified immunity.